# EXHIBIT 5

| Office of Professional Responsibility<br>**FINAL REPORT** | 1. File Number: ▮ | 2. Date: October 28, 2013 |
|---|---|---|
| | 3. File Title: Fuentecilla, Ken (Chemist) | |

| 4. Allegation: | Inattention to Duty, Failure to Follow Written Instructions, and Falsification of Official Documents. |
|---|---|

| 5. Inspectors: ▮ | 6. OPR Team/Field Office:<br>Newark, NJ Field Office |
|---|---|

### PART I – APPROVALS

| 7. Submitted By (Title, Signature and Date): ▮ 10/28/13<br>Inspector ▮ | 8. Reviewed By (Title, Signature and Date): ▮ 10/28/2013<br>Senior Inspector ▮ |
|---|---|

| 9. Approved By (Title, Signature and Date): ▮ 11/01/2013<br>Acting Deputy Chief Inspector ▮ |
|---|

### PART II – NARRATIVE

1. This Drug Enforcement Administration (DEA), Office of Professional Responsibility (OPR), supplemental investigation was conducted pursuant to a memorandum dated April 9, 2013, from former Chairman ▮ (Retired), Board of Professional Conduct (HRB), to Acting Deputy Chief Inspector (DCI) ▮, OPR, entitled: "Request for Supplemental Investigation." In his memorandum, ▮ requested OPR conduct additional interviews to gain specific information regarding the urine sample and information surrounding the work product of Forensic Chemist (FC) Ken Fuentecilla, New York Division, who tested positive for methamphetamine on November 16, 2010. The memorandum requested additional interviews be conducted with Medical Review Officer (MRO) Doctor (Dr.) ▮ Pembrooke Occupational Health; Specimen Collector ▮ Quest Diagnostics; Supervisory Chemist (SC) ▮ Northeast Regional Laboratory (NERL); SC ▮ NERL; and FC Fuentecilla. This OPR supplemental investigation was conducted to obtain the requested information to determine the facts concerning the allegations of Inattention to Duty; Failure to Follow Written Instructions; and Falsification of Official Documents specified against FC Fuentecilla. [TAB 1]

### BACKGROUND INFORMATION:

2. The original OPR investigation was initiated on December 1, 2010, pursuant to a memorandum dated December 1, 2010, from Chief ▮, Health Services Unit, to Deputy Assistant Administrator

OPR Final Report                    **DEA SENSITIVE**                    Page 1 of 7
(June, 2001, TBP)                   Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

| Office of Professional Responsibility<br>**REPORT OF INVESTIGATION**<br>(Continuation) | 1. File Number: ▆▆▆▆▆▆ | 2. Date: October 28, 2013 |
|---|---|---|
| | 3. File Title: Fuentecilla, Ken (Chemist) | |

▆▆▆▆ Forensic Science, entitled: "Report of Positive Drug Test." According to the memorandum, Chief ▆▆ referred to notification from Pembrooke Customized Employment Screening Solutions regarding FC Fuentecilla testing positive for methamphetamine and amphetamine during a random drug test administered on November 16, 2010. The initial test conducted given was deemed invalid due to Quest Diagnostics not "splitting" the sample, which violated Health and Human Services (HHS) mandatory guidelines for testing federal employees. Although the specimen was a non-negative, it could not be confirmed because the collection did not have the second sample, which would be available to the subject who produced the non-negative result. On December 17, 2010, a second test was administered to FC Fuentecilla and the results were "too diluted" to test. On January 6, 2011, a third test was administered FC Fuentecilla, which tested negative. FC Fuentecilla was subsequently removed from the NERL and assigned to the New York Division mail room.

3.     On July 9, 2013, Dr. ▆▆ was contacted and said he reviewed the positive drug test for FC Fuentecilla. [NOTE: Dr. ▆▆ declined to provide a sworn written statement, opting instead to speak with Inspectors via telephone.] Dr. ▆▆ said that on December 1, 2010, he spoke with FC Fuentecilla about the positive drug test conducted on November 16, 2010. Dr. ▆▆ said the initial test "cut off" concentration, as of October 1, 2010, was 300 nano grams (ng)/milliliters (ml). Dr. ▆▆ said that prior to October 1, 2010, the "cut off" concentration was 500 ng/ml. Dr. ▆▆ said a "cut off" level meant any substances detected below these amounts were considered to be negative. Dr. ▆▆ said FC Fuentecilla's levels were very high compared to the "cut off" levels. Dr. ▆▆ said the "cut off" concentration did not differ for chemists due to their potential for exposure. Dr. ▆▆ said he had only reviewed two positive drug tests for the DEA, to include FC Fuentecilla's test, and said positive drug tests for chemists were not common.

4.     Dr. ▆▆ said FC Fuentecilla's 7,260 ng/ml count for methamphetamine was considered high. Dr. ▆▆ said he doubted the level of methamphetamine in FC Fuentecilla's system was due to exposure. Dr. ▆▆ said FC Fuentecilla should have worn gloves if he was concerned about being exposed to items he tested. Dr. ▆▆ said there was no legitimate explanation FC Fuentecilla could provide to have that amount of methamphetamine in his system.

5.     According to Dr. ▆▆ he believed a confirmatory test was completed regarding the sample provided by FC Fuentecilla. Dr. ▆▆ said there was never a policy change regarding "split samples" and said all urine samples were split, which was required by HHS. Dr. ▆▆ said a urine test required 45 cubic centimeters (cc) from a donor. Dr. ▆▆ said that in a 45 cc sample, 30 cc's and 15 cc's were separated into samples A and B. Dr. ▆▆ said sample B would have been available if the donor requested a re-test. Dr. ▆▆ said that during his seven years as a MRO, the samples had always been split.

6.     Dr. ▆▆ said he documented "Yes" as to whether the donor admitted use. Dr. ▆▆ said FC Fuentecilla admitted he handled methamphetamine at work. Dr. ▆▆ was unable to recall if FC Fuentecilla made any further statements or recall why ▆ checked "Yes" to donor admitting drug use.

OPR Final Report                    **DEA SENSITIVE**                    Page 2 of 7
(June 2000, TBP)                    Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

| Office of Professional Responsibility **REPORT OF INVESTIGATION** *(Continuation)* | 1. File Number: ███████ | 2. Date: October 28, 2013 |
|---|---|---|
| | 3. File Title: Fuentecilla, Ken (Chemist) | |

7. Dr. ███ said that when a sample was "too diluted," it was due to the donor simply drinking too much water. Dr. ███ said a sample became too diluted when the sample exceeded 1.0010 ng/ml. According to Dr. ███ when a donor's sample was too diluted it did not mean the donor attempted to mask anything in the sample. Dr. ███ said he had many donors who submitted diluted samples, which were negative for any substances found in the sample. **[TAB 2]**

8. On July 12, 2013, SC ███ was interviewed and Sections 7702.3.B, 7702.3.G, 7706.F, and 7711.A.7 of the Laboratory Operations Manual (LOM) policy referenced DEA policies concerning the use of personal protective equipment (PPE) in the laboratory and the responsibilities of the chemist regarding PPE usage. SC ███ stated, although policy required gloves "shall" be worn when handling evidence or powders, it was fairly common for chemists not to wear gloves while working on exhibits due to several factors. SC ███ stated the factors included, but were not limited to: static electricity generated between gloves and the typical plastic packaging materials causing powders to scatter and be lost, the handling of only the outer packaging materials while pouring/dumping the powders/crystalline materials onto weighing paper/mortars/laboratory plastic bags, and experience in handling evidence to reduce risks of exposure.

9. SC ███ stated ███ regularly observed, and advised all chemists, to include FC Fuentecilla, utilize proper PPE when handling evidence and chemicals. SC ███ stated FC Fuentecilla commonly contracted a reaction when exposed to heroin whether he worked with an exhibit, which contained heroin, or was exposed to it while another chemist worked with an exhibit, which contained heroin. SC ███ stated FC Fuentecilla's reactions typically resulted in a rash and large hive-like lesions on his skin.

10. SC ███ stated these reactions often required to FC Fuentecilla having to take days off to visit doctors. SC ███ stated the effects of heroin led FC Fuentecilla to receive a medical alert from DEA, which required him to obtain medical clearance from his doctor. SC ███ stated ███ provided an electronic mail message (e-mail) where FC Fuentecilla explained why he was delayed in obtaining medical clearance from his dermatologist. SC ███ stated ███ had the medical clearance ███ subsequently received from the DEA Health Services Unit (TAB 3A). [NOTE: SC ███ reviewed and authenticated TAB 3A.] SC ███ stated FC Fuentecilla's frequent reactions kept ███ on high alert regarding ███ use of PPE, to include gloves, and said ███ regularly reminded FC Fuentecilla to protect himself and refrain from touching his face, which was bad habit and led to his (Fuentecilla's) face frequently being affected.

11. SC ███ stated FC Fuentecilla violated Section 7302.14 (Chapter 2, Section 1.0 - Opening Evidence and the Determination of Gross Weight) of the LOM by failing to report a gross weight discrepancy of more than two grams for Exhibit 5 in case number ███ (10 gram discrepancy). According to SC ███ ███ reviewed the records in the case file and box number 16 on FC Fuentecilla's Forensic Chemist Worksheet (DEA-86) had not been reviewed by a SC and the gross weight, which had the 10 gram discrepancy was not witnessed either. SC ███ stated the supervisor review and witness boxes on the DEA-86 would normally be checked during the technical review performed by a SC and it appeared FC Fuentecilla's SF-86 was not reviewed and therefore not caught and corrected.

OPR Final Report
(June 2000, TBP)

**DEA SENSITIVE**
Drug Enforcement Administration

Page 3 of 7

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

| Office of Professional Responsibility<br>**REPORT OF INVESTIGATION**<br>*(Continuation)* | 1. File Number: ▓▓▓ | 2. Date: October 28, 2013 |
|---|---|---|
| | 3. File Title: Fuentecilla, Ken (Chemist) | |

12. SC ▓▓▓ stated that on October 12, 2012, FC Fuentecilla was reassigned to Group 3 and supervised by SC ▓▓▓ when his (Fuentecilla's) DEA-86 report was submitted (December 3, 2010). According to SC ▓▓▓ discovered a memorandum in the case file, which stated the exhibit was re-analyzed by Senior FC ▓▓▓, NERL, at the direction of Laboratory Director ▓▓▓ ▓▓▓, NERL. SC ▓▓▓ stated Senior FC ▓▓▓'s report was contained in the case file (TAB 3B). [NOTE: SC ▓▓▓ reviewed and authenticated TAB 3B. After FC Fuentecilla's failed drug test, SC ▓▓▓ conducted an immediate review of FC Fuentecilla's work product and discovered the aforementioned policy violation and had the exhibit re-analyzed.]

13. SC ▓▓▓ stated that as part of the normal course of business, during ▓ technical review of all laboratory reports, ▓ checked to ensure all gross weight discrepancies were witnessed in accordance with current policies. SC ▓▓▓ failed to recall any instances where FC Fuentecilla failed to have any issues involving gross weight discrepancies witnessed nor recall counseling him regarding the issue. SC ▓▓▓ stated ▓ may have mentioned the issue as part of a general reminder to all chemists in ▓ group during a group meeting as part of general reminders for ensuring the production of the best work product possible at the NERL.

14. SC ▓▓▓ stated that during ▓ supervision of FC Fuentecilla, there were several instances where FC Fuentecilla had to be counseled regarding issues to include maintaining a clean work area, release of DEA sensitive information, and tardiness. SC ▓▓▓ stated that after several counseling sessions, ▓ placed FC Fuentecilla on a leave restriction for two months. SC ▓▓▓ stated that after two months, ▓ reviewed FC Fuentecilla's leave usage (continued tardiness) with him again and issued a second leave restriction for June 2010 through September 2010 when he was transferred from his group (TAB 3C). [TAB 3]

15. On August 2, 2013, Senior Project Manager ▓▓▓, Pembrooke Occupational Health, was contacted regarding several attempts to interview ▓▓▓. [NOTE: Quest Diagnostics was a subsidiary of Pembrooke Occupational Health. ▓▓▓ declined to provide a sworn written statement, opting instead to speak with Inspectors via telephone.] ▓▓▓ said he was ▓▓▓ supervisor and requested to be interviewed in lieu of ▓▓▓. ▓▓▓ said ▓ contacted ▓ regarding DEA's request to interview ▓ regarding the collection of specimen from FC Fuentecilla.

16. When asked if FC Fuentecilla's sample collector documented any information if he had washed his hands or not on November 16, 2010, when the specimen was collected, ▓▓▓ said there was a requirement to document hand washing per federal guidelines. ▓▓▓ said it was the collector's goal to have any donor wash their hands; however, was not required prior to submission of a specimen. ▓▓▓ said if the donor was required to wash his hands, it would have been documentation on the Federal Drug Testing and Control Form (CCF); however, according to HHS Urine Specimen Collection Handbook for Federal Agency Workplace Drug Testing Program (TAB 4A), the donor was instructed to wash and dry his or her hands under the collector's supervision during the collection procedure.

OPR Final Report
(June 2000, TBP)

**DEA SENSITIVE**
Drug Enforcement Administration

Page 4 of 7

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

| Office of Professional Responsibility<br>**REPORT OF INVESTIGATION**<br>*(Continuation)* | 1. File Number: ▮▮▮ | 2. Date: October 28, 2013 |
|---|---|---|
| | 3. File Title: Fuentecilla, Ken (Chemist) | |

17. ▮▮▮ said ▮ trained ▮▮▮ and the HHS Urine Specimen Collection Handbook for Federal Agency Workplace Drug Testing Program was what ▮ was taught and what ▮ followed on a daily basis. ▮▮▮ said that upon review of FC Fuentecilla's paperwork, the first sample was not split per federal guidelines and the test was cancelled. ▮▮▮ said that at the time of FC Fuentecilla's drug screen, federal guidelines to split samples had been recently implemented.

18. When asked if there were standard procedures collectors were required to follow when collecting a specimen, ▮▮▮ said ▮ would forward a copy of the Department of HHS Urine Specimen Collection Handbook for Federal Agency Workplace Drug Testing Program. [NOTE: ▮▮▮ forwarded a copy of the manual to OPR. According to the manual, Chapter 7, page 17, a collector was to instruct the donor to wash and dry his or her hands under the collector's supervision.]  **[TAB 4]**

19. On August 14, 2013, FC Fuentecilla, was interviewed and shown a copy of a MRO Review Sheet, completed by Dr. ▮▮▮ (TAB 5A). [NOTE: It was explained to FC Fuentecilla the MRO Review Sheet documented the conversation between him and Dr. ▮▮▮ on December 1, 2010.] FC Fuentecilla stated he had seen this document before, but never admitted he utilized methamphetamine to Dr. ▮▮▮ According to FC Fuentecilla, when he spoke with Dr. ▮▮▮ he was unaware if he (▮▮▮) knew he was a chemist when the question was asked.

20. FC Fuentecilla was shown a copy of Chapter 73 FR 71858, Section 3.4., entitled: "Analytes and Their Cutoffs the Federal Register dated November 25, 2008, (TAB 5B)." [NOTE: The Federal Register documented guidelines established for all federal employees, which became effective on October 1, 2010. The section documented the analytes (drugs), which are detected in urine samples for all federal employees and their respective "cut-off levels," which if exceeded were considered a positive sample for that specific analyte. For example, if a urine sample tested positive for the analyte Amphetamine (Amphetamine/Methamphetamine), a confirmatory test would be conducted specific to Amphetamine and Methamphetamine (where both analytes needed to be present for a positive methamphetamine test) and anything above 250 ng/ml would be considered positive for methamphetamine.] FC Fuentecilla stated he understood the "cut-off" amounts and both amphetamine and methamphetamine needed to be present in a urine sample for a positive urine sample.

21. FC Fuentecilla was shown a copy of the Quest Diagnostics specimen tracking sheet, laboratory copy (TAB 5C). [NOTE: FC Fuentecilla was shown that his urine sample tested positive for 445 ng/ml of amphetamine and 7260 ng/ml of methamphetamine and acknowledged the amounts reflected on the form.] When asked how he accounted for a high level of methamphetamine in his system when he had not been exposed to methamphetamine (confirmed in his previous interview) prior to his test on November 16, 2010, FC Fuentecilla stated, "I don't know." FC Fuentecilla stated that when he asked for the sample to be re-tested, it was not available. FC Fuentecilla stated he was told it was a mistake on Quest Diagnostic's part and a "split sample" was not available for him. FC Fuentecilla stated he could have been exposed during his analysis of exhibits and had no other explanation. FC Fuentecilla stated, "It seems like too much for, to be a mistake." When asked if he thought the levels were too high for exposure rather than ingestion,

OPR Final Report<br>(June 2000, TBP)     **DEA SENSITIVE**<br>**Drug Enforcement Administration**     Page 5 of 7

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

| Office of Professional Responsibility **REPORT OF INVESTIGATION** *(Continuation)* | 1. File Number: | 2. Date: October 28, 2013 |
|---|---|---|
| | 3. File Title: Fuentecilla, Ken (Chemist) | |

FC Fuentecilla stated, "I'm not sure." FC Fuentecilla stated, "That seems like a number that, for a user, I mean, that seems so high." FC Fuentecilla stated, due to the high levels, he wanted a re-test because it the test results had to be a mistake.

22. When asked if the aforementioned levels were too high from exposure during testing, FC Fuentecilla stated, "Well, I don't know, I don't know what the numbers would be if it was just exposure." According to FC Fuentecilla, he was 1unsure what the "cut-off" level numbers would be for exposure from analyzing methamphetamine.

23. FC Fuentecilla stated he was allowed to maintain exhibits in his possession for 30 days or re-submit the exhibits to the vault and re-set the clock. FC Fuentecilla was shown a Laboratory Evidence Management System (LEMS) report dated February 4, 2010, to February 4, 2011 (TAB 5D). FC Fuentecilla initially stated he maintained methamphetamine exhibits in his possession for an extended period of time because most of the Chicago exhibits did not have a deadline. [NOTE: The NERL assisted the Chicago laboratory with examining their (Chicago laboratory) overflow exhibits. The same LOM policy applied to the analysis of both Chicago and New York exhibits.] FC Fuentecilla stated he would be able to take a Chicago exhibit out of the vault and hold on to it while he worked on New York exhibits which had a deadline.

24. When asked if he completed the cocaine exhibits quicker than methamphetamine exhibits, FC Fuentecilla stated, "Yeah." FC Fuentecilla failed to recall how he completed examination of cocaine exhibits versus methamphetamine exhibits. FC Fuentecilla stated the exhibits he was unable to complete were returned to the vault and then he took them back out. FC Fuentecilla stated he believed his actions were just a coincidence that he re-set the clock on several methamphetamine exhibits.

25. FC Fuentecilla stated his former supervisor (SC ▮▮▮) told him he was able to utilize his annual leave in the morning because he rarely took full days off. FC Fuentecilla stated he did not look at his actions as being tardy and viewed his late arrival to work as usage of approved annual leave. FC Fuentecilla stated SC ▮▮▮ informed him ▮ believed he (Fuentecilla) began to abuse his annual leave by using the leave to cover his tardiness issues. FC Fuentecilla stated he stopped using his annual leave in the morning when SC ▮▮▮ told him he could no longer do so.

26. When asked if he shaved his head after his positive drug test on November 16, 2010, FC Fuentecilla stated his hair was always shaved. FC Fuentecilla denied he shaved his head bald after the test and continued to wear his hair in the same manner he had always done.

27. When asked if he was asked to wash his hands prior to providing a urine sample, FC Fuentecilla stated, "I believe so, yes." FC Fuentecilla stated he did not know if washing one's hands prior to providing a urine sample was standard procedure. FC Fuentecilla failed to recall if he washed his hands; however, said if he was instructed to do so, he would have.

28. FC Fuentecilla failed to recall if he intentionally deleted his e-mails on November 16, 2010. According to FC Fuentecilla, he received an e-mail from Director ▮▮▮, which initially notified him of

OPR Final Report
(June 2000, TBP)

**DEA SENSITIVE**
Drug Enforcement Administration

Page 6 of 7

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

| Office of Professional Responsibility<br>**REPORT OF INVESTIGATION**<br>*(Continuation)* | 1. File Number: ▮▮▮▮ | 2. Date: October 28, 2013 |
|---|---|---|
| | 3. File Title: Fuentecilla, Ken (Chemist) | |

the drug test. Later in his interview, FC Fuentecilla recanted his prior statement and stated he was notified either by e-mail or "word of mouth" regarding the random drug test on November 16, 2010. FC Fuentecilla stated he received e-mails in the past from Director ▮▮▮▮ and was on the NERL truncated recipient list. **[TAB 5]**

29. On September 5, 2013, Information Security Specialist ▮▮▮▮, Validation, Integrity and Penetration Response Unit (ISIV), produced a Report of Investigation, which reflected he did not locate any e-mails between FC Fuentecilla and FC ▮▮▮▮, NERL. Specialist ▮▮▮▮'s report reflected he reviewed e-mail records from January 1, 2010, to January 1, 2011, with negative results. **[TAB 6]**

30. On September 25, 2013, SC ▮▮▮▮ was interviewed and stated ▮▮ reviewed additional exhibits during the specified time frame of February 4, 2009, to February 4, 2010, regarding FC Fuentecilla. SC ▮▮▮▮ stated that during this time frame, 25 exhibits were examined and reported as containing methamphetamine by FC Fuentecilla. SC ▮▮▮▮ stated 6 of the 25 exhibits were re-transacted (also known as re-setting the clock) from the vault. SC ▮▮▮▮ provided the following exhibit and case numbers, which were re-transacted by FC Fuentecilla: Exhibit 79 from case number ▮▮▮▮; Exhibits 2, 3, 4, and 6 from case number ▮▮▮▮, and Exhibit 3 from case number ▮▮▮▮.

31. SC ▮▮▮▮ stated of the six exhibits, one exhibit (Exhibit 6 from case number ▮▮▮▮) was in FC Fuentecilla's custody for 35 days. SC ▮▮▮▮ stated the exhibit was transacted from the vault on November 6, 2009, returned and re-transacted on December 11, 2009, and completed and returned on December 31, 2009. SC ▮▮▮▮ stated, according to FC Fuentecilla's DEA-86 he (Fuentecilla) documented he received the exhibit on December 14, 2009, from Evidence Technician ▮▮▮▮, New York Division (TAB 7A). SC ▮▮▮▮ stated there were no recorded transactions in LEMS on December 14, 2009, for Exhibit 6 from case number ▮▮▮▮.

32. SC ▮▮▮▮ stated FC Fuentecilla was under ▮▮ supervision for approximately one month prior to the initiation of the OPR investigation. SC ▮▮▮▮ stated that for a period of one month, ▮▮ failed to recall observing FC Fuentecilla without the proper PPE, to include the use of latex gloves when he performed case analysis. SC ▮▮▮▮ stated had ▮▮ observed FC Fuentecilla inconsistent with established safety policies, she would have instructed him to utilize the appropriate PPE. SC ▮▮▮▮ stated it was not common practice for the chemists at the NERL to handle evidence without the use of PPE, to include lab coats, gloves and goggles. **[TAB 7]**

33. All investigation in this matter is completed and is subject to further instructions from the Acting DCI, OPR.

OPR Final Report
(June 2000, TBP)

**DEA SENSITIVE**
Drug Enforcement Administration

Page 7 of 7

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

## Supplemental Final Report

## Fuentecilla, Ken
## (Chemist)

## TABLE OF CONTENTS

| TAB | DESCRIPTION |
|---|---|
| 1. | Memorandum dated April 9, 2013, from former Chairman ▮▮▮ to Acting DCI ▮▮▮, OPR, entitled: "Request for Supplemental Investigation, OPR Investigative File ▮▮▮, Forensic Chemist Ken S. Fuentecilla," with no attachments. |
| 2. | OPR-6 dated July 2, 2013, by Inspector ▮▮▮ entitled: "Contact with Doctor ▮▮▮ on July 2, 2013," with no pages attached. |
| 3. | OPR-6 dated August 1, 2013, by Inspector ▮▮▮ entitled: "Sworn-Statement of ▮▮▮ Conducted on July 2, 2013," with 28 pages attached. |
| 3A. | Medical clearance for FC Fuentecilla. |
| 3B. | Memorandum dated January 10, 2011, by SC ▮▮▮ to Case File, entitled: "▮▮▮, exhibit #5," with ten pages attached. |
| 3C. | Four memorandums. |
| 4. | OPR-6 dated August 2, 2013, by Inspector ▮▮▮ entitled: "Contact with ▮▮▮ Conducted on August 2, 2013," with 32 pages attached. |
| 4A. | Department of HHS Substance Abuse and Mental Health Services Administration Center for Substance Abuse Prevention, Urine Specimen Collection Handbook for Federal Agency Workplace Drug Testing Programs. |
| 5. | OPR-6 dated September 23, 2013, by Inspector ▮▮▮ entitled: "Sworn-Statement of Ken Fuentecilla Conducted on August 14, 2013," with 45 pages attached. |
| 5A. | Copy of MRO Review Sheet |

|  |  |  |
|---|---|---|
|  | 5B. | Copy of Federal Register, Analytes and Their Cutoffs, effective date October 1, 2010. |
|  | 5C. | Copy of Quest Diagnostics Specimen Form |
|  | 5D. | LEMS Report for February 4, 2010 to February 4, 2011 |
| 6. |  | DEA-6 dated September 5, 2013, by Specialist ▮, entitled: "Forensic Examination of Firebird email of ▮," with one page attached. |
| 7. |  | OPR-6 dated September 25, 2013, by Inspector ▮ entitled: "Sworn-Statement of ▮ Conducted on September 25, 2013," with six pages attached. |
|  | 7A. | Copy of Form DEA-86, dated December 18, 2009. |